IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:17CR207 |
| vs. | **FINDINGS AND RECOMMENDATION** |
| ALFREDO VALQUIER, | |
| Defendant. | |

This matter is before the Court on the Motion to Suppress Evidence ([Filing No. 60](#)) filed by Defendant, Alfredo Valquier. While Defendant did not file a brief in support of the motion as required by the Criminal Rules of the United States District Court for the District of Nebraska, see NECrimR [12.3](#)(b)(1), Defendant's argument was contained in his motion and will be accepted by the Court in this instance in satisfaction of the Rule's requirement. The government filed a brief in opposition to the motion ([Filing No. 64](#)).

The Court held an evidentiary hearing on the motion on September 21, 2017. Defendant was present with his attorney, Travis J. Penn. The government was represented by Assistant United States Attorney, Thomas J. Kangior. Department of Homeland Security ("DHS") Special Agent Andrew Vincik ("Special Agent Vincik") testified on behalf of the government. No exhibits were offered by either party. A transcript (TR.) of the hearing was prepared and filed on September 25, 2017. ([Filing No. 69](#)). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied.

**BACKGROUND**

One June 7, 2017, Special Agent Vincik received a call from the Lancaster County Sheriff's Office. (TR. 6). Special Agent Vincik has been employed with DHS for more than fifteen (15) years and is assigned to the Narcotics Unit. He has conducted hundreds, if not thousands, of interviews. (TR. 5-6). The call related a stop of a vehicle that was traveling eastbound on Interstate 80 in Lancaster County, Nebraska. Subsequent to the stop, a search of the motor vehicle resulted in the discovery of thirty-five (35) pounds of methamphetamine destined for Omaha. (TR. 6).

An occupant of the vehicle was willing to cooperate and a controlled delivery was planned. The cooperating individual made phone calls and was able to lure two individuals, later identified as Alejandro Buendia-Ramirez ("Alejandro") and Carlos Valquier ("Carlos") (co-defendants in this case) to a hotel. When Alejandro and Carlos arrived at the hotel, they were carrying currency and took receipt of the controlled substances. Alejandro and Carlos were both taken into custody. (TR. 6-7). During a post-*Miranda* interview, Carlos said he was going to be paid $500.00 to give a ride to Alejandro to a rented house, which officers believed was a stash house. Carlos also indicated that his "brother" was involved, but did not provide his name. (TR. 9-10). Carlos suspected that the money and/or the ride was for something dangerous, hinting that is was probably drug related. The house, located at 3102 S. 15th Street, Omaha, Nebraska, was rented by Carlos and was being used by Alejandro. (TR. 7-8). Carlos agreed to a consent search of the rental house. Officers suspected that they would find narcotics and/or currency. (TR. 9). Officers created multiple teams with regard to the consent search of the house and to conduct interviews at the Douglas County Jail. (TR. 10-11).

Special Agent Vincik went to the house with a deputy from the Lancaster County Sheriff's Office. When he arrived, between ten to twelve law enforcement officers were there and had set up a perimeter around the house. One group of agents worked with Carlos to get the signed consent form to document the search. Special Agent Vincik was informed that an individual, later identified as the Defendant, had arrived in a black SUV. Officers had detained Defendant and he was seated on a curb in handcuffs. Officers did not know Defendant's identity at that time, and although he consented to a search of his vehicle to look for identification, officers found none. (TR. 11-12).

Special Agent Vincik, the case agent in this matter, walked up to Defendant and asked, "[W]ho are you and why are you here?" (TR. 12). Defendant replied that his name was Alfredo Valquier and stated that he was there because he had heard that the house was for rent and he was looking at it as a potential rental property. (TR. 12). At this point, Special Agent Vincik recognized Defendant's last name and suspected that Defendant was Carlos Valquier's brother and was being untruthful. Namely, Special Agent Vincik knew that Carlos had already rented the house and therefore it would have been unlikely that Defendant was there to look at renting the same property. At that point, Defendant was put in the back seat of Special Agent Vincik's police vehicle. (TR. 13).

Special Agent Vincik then told Defendant that his brother had already rented the residence, that his brother was cooperating, that his brother had signed a consent form for a search of the residence, and that law enforcement was going to search the residence. Special Agent Vincik stated his interest in who Defendant was and what he was doing, and expressed his belief that Defendant was at the house to collect possible drugs or money. Special Agent Vincik testified that he provided the information to Defendant to explain to him why he was being detained. (TR. 16). At that time, Defendant "kind of hung his head." (TR. 14). Special Agent Vincik proceeded to read Defendant his *Miranda* warnings. Defendant requested an attorney and any questioning was ceased. (TR. 14-15).

On June 8, 2017, a Complaint was filed alleging that Defendant had engaged in a conspiracy and/or possession with intent to deliver methamphetamine, in violation of 21 U.S.C. § 846. (Filing No. 1). On June 21, 2017, Defendant was charged in a one count Indictment with conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture of substance containing a detectable amount of methamphetamine, its salts, isomers or salts of its isomers, a Schedule II controlled substance in violation of Title 21, United States Code, §§ 841(a)(1) and 841(b)(1),in violation of 21 U.S.C. § 846.

Defendant has filed the instant motion to suppress any statements and gestures he made while in custody prior to receiving *Miranda* warnings, in violation of his Fifth Amendment right to be free from self-incrimination.

## ANALYSIS

The government concedes that Defendant was in custody from the time he was placed in handcuffs by a deputy from the Lancaster County Sheriff's Office and therefore was in custody at the time of the initial contact with Special Agent Vincik. (Filing No. 64 at p. 2). Thus, the question before the Court is whether Defendant was interrogated in violation of his *Miranda* rights under the Fifth Amendment. In other words, did Special Agent Vincik ask questions that tended to incriminate or, through his actions, create the functional equivalent of an interrogation? See *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (footnote omitted).

"Interrogation occurs only when there is express police questioning or its 'functional equivalent,' which means 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States*

*v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016) (quoting *Innis*, 446 U.S. at 300-01). "[N]ot all government inquiries to a suspect in custody constitute interrogation and therefore need be preceded by *Miranda* warnings." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). Officers do not have to give *Miranda* warnings when asking a defendant for identification or routine booking questions such as, "What is your name?" and "Do you have a driver's license?" because the responses to such questions are not self-incriminating. See *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)(concluding that questions about a suspect's identification such as his name, where he lives, and how long he lived there, do not require *Miranda* warnings to be given); see also *McLaughlin*, 777 F.2d at 391 ("[A] request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating."). However, this exception "does not apply when 'the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (quoting *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996)).

In this case, the Court agrees with the government that Special Agent Vincik's initial questions to Defendant, asking who he was and why he was there, were not questions that would reasonably lead to incriminating responses, but rather were questions aimed at dispelling any possible suspicion as to why Defendant was present at the scene of the execution of a search warrant. When Special Agent Vincik arrived at the house, he did not know who Defendant was and thus initially asked one compound question to obtain "routine information necessary for basic identification purposes." *McLaughlin*, 777 F.2d at 391. There was no reason for Special Agent Vincik to reasonably suspect that Defendant's answer would be incriminating or would relate to the substantive offense charged. See *Cowan*, 674 F.3d at 958. Therefore, Defendant's response that he had heard the house was for rent and was there to look at it was not obtained in violation of *Miranda.*

Furthermore, Defendant's head dropping was not testimonial in nature, nor was it the result of interrogation. In order to be testimonial, the "communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Muniz*, 496 U.S. at 594 (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)). Special Agent Vincik testified that Defendant "kind of hung his head" after Special Agent Vincik informed Defendant about the investigation and explained to Defendant why he was being detained. Defendant's head dropping is not a

4

communication relating a factual assertion or disclosing information. Additionally, the statements made by Special Agent Vincik regarding the investigation were not reasonably calculated to lead to an incriminatory response from Defendant (to the extent hanging one's head is considered an incriminatory testimonial communication). Defendant had asked the initial investigator why he was being arrested or handcuffed, and Special Agent Vincik's narrative explained to Defendant all the reasons for his detention. See, e.g., *United States v. Lockett*, 393 F.3d 834, 838 (8th Cir. 2005)(quoting *Innis*, 446 U.S. at 301)(concluding defendant's statements were not a product of police interrogation, but instead were voluntary statements made in response to officer's replies "to [defendant's] inquiries about the investigation" and were "part of a conversation 'normally attendant to arrest and custody.'"). Here, as in *Lockett*, Defendant had inquired himself why he was arrested, and Special Agent Vincik's statements explained to Defendant why he was in custody.

Defendant was not initially a suspect, and when he became a suspect, Special Agent Vincik did not engage in questioning reasonably calculated to lead to incriminatory responses prior to giving Defendant *Miranda* warnings in accordance with the protections afforded Defendant under the Fifth Amendment. Because Defendant was not subjected to custodial questioning by Special Agent Vincik in a manner that would reasonably lead to incriminatory responses, Defendant's rights under the Fifth Amendment to the United States Constitution were not violated and any statements or gestures made by Defendant were not the result of unlawful police conduct. Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter that Defendant's Motion to Suppress Evidence (Filing No. 60) be denied.

Dated this 2nd day of October, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.